**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| GERALD YOSOWITZ, | ) | CASE NO. 1:15CV2382 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Gerald Yosowitz ("Plaintiff" or "Yosowitz"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) & 423.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In September 2012, Yosowitz filed applications for POD and DIB, alleging a disability

onset date of April 15, 1998 and claiming he was disabled due to "strokes, back surgeries, hole

in brain, heart disease, angioplasty, colitis, depression, anxiety, nerve damage in hands, difficulty

hearing."[1]  (Transcript ("Tr.") 19, 80-81.)  The applications were denied initially and upon

reconsideration, and Yosowitz requested a hearing before an administrative law judge ("ALJ").

(Tr. 19, 80-99, 123-134.)

On March 19, 2014, an ALJ held a hearing, during which Yosowitz, represented by

counsel, and an impartial vocational expert ("VE") testified.  (Tr. 36-77.)  On October 24, 2014,

the ALJ issued a written decision finding Yosowitz was not disabled.  (Tr. 19-31.)  The ALJ's

decision became final on September 21, 2015, when the Appeals Council declined further

review.  (Tr. 1-3.)

On November 20, 2015, Yosowitz filed his complaint to challenge the Commissioner's

final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12,

15.)  Yosowitz asserts the following assignment of error:

> (1)    The Administrative Law Judge's Decision that Plaintiff can perform light
>        work is not supported by substantial evidence particularly because he did
>        not consult with a medical expert.

(Doc. No. 12.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Yosowitz was born in October 1949 and was 48 years old at the time of his alleged onset

date of April 1998, making him a "younger" person under social security regulations.  (Tr. 80.)

*See* 20 C.F.R. § 416.963(c).  Yosowitz was 51 years old on his date last insured ("DLI") of

December 31, 2000, however, causing him to change age categories to a "person closely

---

[1] Yosowitz also filed a Title XVI application for Supplemental Security Income ("SSI")
in September 2012.  (Tr. 19, 100.)  The record reflects this application was granted and
Yosowitz was found disabled effective the date of the application.  (Tr. 19, 119.)

2

approaching advanced age."  *See* 20 CFR § 416.963(d).  He has a college education and past

relevant work as a president of a furniture store.  (Tr. 24, 29, 47, 68.)

**B.**    **Relevant Medical Evidence**[2]

The record reflects Yosowitz underwent two back surgeries prior to his alleged onset

date, the first in February 1994 and the second in July 1997.  (Tr.  332, 771, 823.)  Treatment

records indicate Yosowitz continued to complain of chronic back pain after his 1997 surgery.

In August 1998, Yosowitz presented to Isador Lieberman, M.D., complaining of ongoing

back pain and new onset neck and right arm pain.  (Tr. 780.)  Yosowitz stated he was "trying to

exercise on a regular basis but despite that he still has significant pain."  (*Id*.)  Examination

revealed limited active range of motion of his cervical spine.  (*Id*.)  Sensory examination and

reflexes were normal, however, and motor examination of Yosowitz's upper extremities did not

reveal any asymmetrical weakness.  (*Id*.)  Dr. Lieberman concluded Yosowitz "does have

radicular type symptoms but no obvious radicular signs into the upper extremities."  (*Id*.)  He did

not recommend any further intervention and suggested instead that Yosowitz continue with his

exercise program.  (*Id*.)

Yosowitz returned to Dr. Lieberman on December 9, 1998, "still complaining of a non-

specific chronic pain pattern."  (Tr. 779.)  Dr. Lieberman stated "there is no doubt he has

structural abnormalities of the cervical and lumbar spine, but I do not feel that I can improve the

situation to any significant extent."  (*Id*.)  He was "very reluctant to recommend any form of

---

[2] As both the ALJ and the parties limit their discussion of the medical evidence to the
time period between Yosowitz's April 15, 1998 alleged onset date and his December 31,
2000 DLI, this Report & Recommendation will confine its discussion to medical
evidence relevant to that time frame.

3

surgical intervention," and referred Yosowitz for treatment with the Chronic Pain Clinic and Failed Back Clinic.  (*Id.*)

Shortly thereafter, on December 15, 1998, Yosowitz presented to P. Sinks, M.D., for evaluation of his back and right leg pain.  (Tr. 771-778.)  He reported experiencing constant chronic back pain despite his 1994 and 1997 back surgeries.  (Tr.  771.)  Yosowitz also complained of stiffness and numbness in his neck, and radiating pain traveling down his right leg with cramping in his foot.  (Tr. 773.)  His medications at that time included Clonidine, Klonopin, Soma, and Vicodin.  (Tr. 772.)

Examination revealed antalgic gait, bilateral positive straight leg raising, and limited range of motion in Yosowitz's cervical and lumbar spines.  (Tr. 775-776.)  Dr. Sinks noted, however, several positive Waddell's signs,[3] including overreaction and an inappropriate response to seated straight leg raising while distracted.  (Tr. 776.)  Yosowitz's reflexes were normal, and his strength was either 4/5 or 5/5.  (*Id.*)  Dr. Sinks assessed failed back surgery syndrome, and recommended imaging studies as well as physical therapy and psychological pain evaluation.

---

[3] "A positive Waddell's sign indicates that there exists a non-organic (i.e. psychological or psychosocial) component to an individual's lower back pain."  *Huckleberry v. Comm'r of Soc. Sec.*, 2012 WL 3886431 at note 1 (E.D. Mich. Aug. 6, 2012) (citations omitted); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 420 (6th Cir. 2008) (Waddell's signs are a clinical test for patients with low back pain that can be used to indicate whether the patient is exaggerating symptoms); *Mabra v. Comm'r of Soc. Sec.*, 2012 WL 3600127 at note 3 (S.D. Ohio Aug. 21, 2012) ("'Waddell's signs' refers to a system of identifying psychogenic or nonorganic manifestations of pain.") (citations omitted); *Hedden v. Comm'r of Soc. Sec.*, 2011 WL 7440949, at *12 (W.D. Mich. Sept. 6, 2011) ("In the context of a claim for compensation, nonorganic signs may (reasonably) raise the question of 'malingering'.  However, nonorganic signs are common in chronic pain patients in a clinical setting where there is no compensation.  Thus, the presence of nonorganic signs *per se* does not necessarily mean that a patient is lying or attempting to deceive the examiner....") (quoting Gordon Waddell, M.D., Waddell's Signs—Do they Mean Malingering?, Disability Medicine, March–June 2004 at 38).

(Tr. 778.)

On January 10, 1999, Yosowitz presented to the emergency room ("ER") for treatment of an acute exacerbation of his chronic low back pain. (Tr. 328-330.)  He also complained of parasthesia and pain radiating to his right leg.  (Tr. 329.)  Examination revealed adequate but painful range of motion, as well as tenderness to the lower back spine, paraspinal area.  (*Id.*)  Yosowitz was given oral pain medication, followed by intravenous Demerol "because of lack of complete relief."  (*Id.*)  The attending physician diagnosed low back pain syndrome, exacerbation; and hypertension.  (*Id.*)  Yosowitz was discharged the same day in stable condition.  (*Id.*)

Two days later, on January 12, 1999, Yosowitz returned to the ER complaining of "extreme exacerbation" of his low back pain with radiation to his right leg and foot.  (Tr. 331-332.)  Yosowitz explained he had attempted to undergo an MRI that day but was unable to lay on the MRI table secondary to his chronic back pain.[4]  He stated that, when he was removed from the MRI machine, "he attempted to stand on his right leg, felt an electric shock sensation and severe pain traveling from his right leg ascending his right lower leg, right upper leg and being felt in his lumbar back region, resulting in severe back pain to the point that he was unable to bear weight on his right leg at that time."  (Tr. 331.)  He was then transferred to the ER for evaluation and treatment.  (*Id.*)  On examination, attending physician Daniel Kranitz, D.O., noted Yosowitz was able to straight leg raise to 45 degrees with his left leg, and able to straight leg raise to 45 degrees with his right leg with difficulty.  (Tr. 332.)

_____

[4] It appears Yosowitz did undergo an x-ray of his lumbar spine, which revealed disc space narrowing at the L4-5 level and degenerative changes in the facet joints of the lower lumbar spine. (Tr. 582.)

5

Dr. Kranitz consulted with Dr. Lieberman, who recommended Yosowitz be admitted "for intractable back pain and [to] allow for MRI images to be obtained, Psychiatry involvement and Chronic Pain Management to become involved."  (*Id.*)  Dr. Kranitz noted that Yosowitz "became extremely unreasonable when admission to the hospital . . . was discussed."  (*Id.*)  Yosowitz apparently stated "he came to the ER only for pain control and wished therapy as an outpatient to be provided by the Emergency Department."  (*Id.*)  When Dr. Kranitz explained this was not possible, Yosowitz "remained angry, dissatisfied and was verbally aggressive with his wife when attempts were made to explain to the patient his need for admission."  (Tr. 333.)  In an addendum, Dr. Kranitz noted that, "[d]uring this time, [Yosowitz's] speech was slurred, his thoughts seemed to be somewhat disorganized and [his] interpretation of events happening around him appeared to be somewhat skewed."  (Tr. 782.)  Yosowitz was discharged home in the care of his wife, with instructions to follow up with Dr. Lieberman, psychiatry, and pain management.  (Tr. 782-783.)  Dr. Kranitz concluded by remarking that "[i]ncidentally, he is able to ambulate through the department upon discharge."  (Tr. 783.)

In February 1999, Yosowitz underwent an MRI of his lumbar spine, which revealed the following:

> A modest amount of epidural fibrosis is seen posterolaeral to the thecal sac at this level, extending into the lateral recess of the L5 vertebral body superiorly.  There is narrowing of the intervertebral disc spaces at L4-5 and L5-S1 with broad-based bulging of the annulus fibrosus, but no evidence of recurrent or retained disc fragment. Osteoarthrosis is seen at the facet joints at L5-S1 with at least moderate foraminal narrowing on the left.  There is no evidence of discitis.  No evidence of epidural fluid collection or abscess.  No evidence of arachnoiditis.  The remainder of the vertebral bodies and intervertebral discs are relatively unremarkable.

(Tr. 583.)

In April 2000, Yosowitz presented to the ER complaining of chest pain.  (Tr. 823-824.)

6

He underwent an EKG, which showed normal sinus rhythm with non-specific intra-ventricular conducting defect.  (*Id*.)  Attending physician Zuhayr T. Madhun, M.D., determined "the EKG changes are concerning" and admitted Yosowitz for diagnosis, management, and observation.  (*Id.*)  In addition, Dr.  Madhun ordered Yosowitz be started on a fixed dose of nitroglycerin and undergo a echo stress test "ASAP today."  (*Id*.)  The following month, Yosowitz underwent a cardiac catheterization, a coronary arteriogram, and an angiocardiogram.  (Tr. 814.)

     In September 2000, Yosowitz presented to the Cleveland Clinic Alcohol and Drug Recovery Center due to his "inability to discontinue unnecessary medication."  (Tr. 792-798.)  In an Outpatient Intake Interview, Yosowitz explained he "was given and taking a lot of pain meds" and was "still on Klonopin."  (Tr. 792.)  He reported attending a one month treatment program in 1999, during which he was detoxed from benzodiazepine and opiate pain medications (with the exception of Klonopin).  (*Id*.)  Yosowitz also stated he had been seen in the ER in October 1999 and diagnosed with "combination drug dependence, psychogenic pat, and panic disorder."  (Tr. 793.)  He admitted to a lengthy chemical use history, including past use of alcohol, marijuana, heroin, methadone, opiates, and benzodiazepines.  (Tr. 795-796.)  In particular, Yosowitz stated he abused Klonopin and that his current use was "11 to 12 mg," everyday.  (Tr. 796.)

     Upon examination, intake counselor Bridget Dwyer, B.S., C.T., noted blunted affect, "somewhat depressed" mood, and slow and dysarthic speech.  (*Id*.)  However, Yosowitz was alert and oriented in all spheres; his thoughts were logical and relevant; and there was no evidence of psychosis or cognitive dysfunction.  (*Id*.)  Ms. Dwyer found Yosowitz's weaknesses included poor coping strategies and poor personal judgment.  (*Id*.)  Yosowitz was diagnosed with Klonopin dependence, status post alcohol abuse; history of opiate abuse; remote polydrug abuse;

7

and mixed personality disorder with passive dependent features.  (Tr. 797.)  It was recommended that he undergo detoxification and pain evaluation.  (*Id*.)

On March 12, 2001, Yosowitz was brought to the ER by his wife for psychiatric evaluation.  (Tr. 805-808.)  He reported treatment with Melvin Chavinson, M.D., since October 2000, including therapy twice per week and prescriptions for Paxil, Neurontin, Ativan, and Chlorpromazine.  (Tr. 805.)  Yosowitz complained of increased depression, negative thoughts, and poor sleep.  (*Id*.)  He felt scared, angry, anxious, helpless, and hopeless with decreased energy, poor concentration, and lack of interest in outside activities.  (*Id*.)  Examination upon admission revealed normal speech and coherent thought processes, but depressed mood and dysphoric and anxious affect.  (Tr. 806.)

Yosowitz was admitted for a possible workup for electroconvulsive therapy ("ECT"). (*Id*.)  After admission, "it appeared that [Yosowitz] was abusing his Ativan prescription;" i.e., taking twice the prescribed dosage and using Ativan that had been prescribed for his daughter. (*Id*.)  Psychiatric testing was ordered.  (Tr. 807.)  On March 14, 2001, Yosowitz indicated he wished to be discharged.  (*Id*.)  As he was not suicidal or homicidal, he was allowed to go home on that date.  (*Id*.)  He was given final diagnoses of mood disorder not otherwise specified; rule out bipolar II disorder; and benzodiazepine dependence.  (*Id*.)  He was assessed a Global Assessment of Functioning ("GAF") of 40, indicating major impairment.[5]  (*Id.*)

---

[5] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . .

8

C.      **State Agency Reports**

1.      **Physical Impairments**

In December 2012, state agency physician Bradley Lewis, M.D., reviewed Yosowitz's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment for the period between the April 1998 alleged onset date and the December 2000 DLI.  (Tr. 92-94.) Dr. Lewis concluded Yosowitz could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (*Id.*)  He further opined Yosowitz could frequently climb ramps and stairs; frequently crawl; and occasionally stoop, crouch, and climb ladders, ropes and scaffolds.  (*Id.*) Dr. Lewis found Yosowitz had no manipulative limitations; unlimited push/pull capacity; and no limitations in his ability to balance and kneel.  (*Id.*)  Finally, Dr. Lewis found Yosowitz should avoid concentrated exposure to extreme cold and heat.  (*Id.*)

Subsequently, in February 2013, state agency physician Leslie Green, M.D., reviewed Yosowitz's medical records and completed a Physical RFC Assessment, also for the period between the April 1998 onset date and the December 2000 DLI.  (Tr. 129-131.)  Dr. Green reached the same conclusions regarding Yosowitz's physical functional limitations as Dr. Lewis. (*Id.*)

2.      **Mental Impairments**

In December 2012, state agency psychologist Bruce Goldsmith, Ph.D., reviewed Yosowitz's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 90-

_____

and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

91.)  With respect to the time period at issue herein,[6] Dr. Goldsmith concluded as follows:

> Title II DLI is 12/31/00.  Although the [claimant] alleges depression and anxiety and memory problems related to stroke in 1998, findings do not support a severe psych impairment prior to the DLI of 12/31/00.  There was no indication of a severe psych [medically determinable impairment] prior [to] the DLI.  Even records after this seem to indicate depression was a later occurrence and was stable.

(Tr. 91.)  State agency psychologist Caroline Lewin, Ph.D., reviewed Yosowitz's medical records in February 2013 and completed a PRT technique for the period prior to the December 2000 DLI.  (Tr. 128.)   Dr. Lewin reached the same conclusions as Dr. Goldsmith.  (*Id*.)

**D.**    **Hearing Testimony**

During the March 19, 2014 hearing, Yosowitz testified to the following:[7]

- Between April 1998 and December 2000, he was married and living with his spouse and daughter.  (Tr. 46.)  He had a college education and work experience as the president of a retail furniture store.  (Tr. 47-48.)

- He had a serious stroke in April 1998, which was caused by a blood clot that traveled to his brain and "put a large hole in [his] cerebellum."  (Tr. 47-48.)  For months after this stroke, he could not walk at all and "just laid on the ground vomiting."  (Tr. 48.)  Over the course of the next few years, he had to teach himself to walk again.  (*Id*.)  In addition, this stroke drastically affected his memory and concentration, as well as his ability to "carry a thought from beginning to end."  (Tr. 62.)[8]

---

[6]  Dr. Goldsmith also completed a Mental RFC Assessment.  It is unclear but it appears this Assessment relates to Yosowitz's mental functional limitations at the time of the December 2012 Assessment.  (Tr.  94-96.)  Yosowitz does not argue that Dr. Goldsmith's RFC Assessment is relevant to the issues raised in this matter.

[7]  At the outset of the hearing, the ALJ explained that Yosowitz was required to establish disability on or before his December 31, 2000 DLI.  (Tr. 40.)  Accordingly, the ALJ stated that his questioning would focus on the time period between Yosowitz's April 15, 1998 onset date and the December 31, 2000 DLI.  (Tr. 45-46.)

[8]  During the hearing, the ALJ remarked that the record did not appear to contain documentation regarding Yosowitz's April 1998 stroke.  (Tr. 40, 73-74.)  Yosowitz stated he had obtained records relating to this condition and personally delivered them to

- Prior to his stroke, he experienced back problems and pain.  (Tr. 49-50.)  His back problems were mostly "wear and tear" from playing high school and college football and lifting furniture as part of his furniture business.  (*Id*.)  He had back surgery in 1994, which improved his pain.  (Tr. 50-51.)  However, in 1997, the discs in his back "crumbled and collapsed on top of themselves," causing a "tremendous amount of pain."  (Tr. 51.)

- He underwent a second back surgery in September 1997.  (Tr. 50-51.)  After this second surgery, he was in "far more pain."  (Tr. 51. )  The time period after his second surgery was a "nightmare" during which he experienced "indescribable" lower back and leg pain.  (*Id*.)  His doctors advised him against any further surgeries.  (Tr. 51-52.)

- Between his April 1998 stroke and 2000, he could not stand up or stop vomiting. (Tr. 53.)  He also experienced tremendous back pain and became "more and more depressed."  (Tr. 53-54.)  He was treated with "so many pain pills" that he "was just falling asleep all the time."  (Tr. 60.)  He was also prescribed multiple anti-depressants which "affected [his] ability to think."  (*Id*.)

- After his September 1997 back surgery, he "did not know what to do with himself in terms of the pain."  (Tr. 57.)  He tried physical therapy but it did not help.  (Tr. 57-58.)  Later, he went to a pain rehabilitation center in Boston for thirty days, which was "wonderful."  (Tr. 58.)  Although the pain still remained, the center taught him "think differently about the pain."  (*Id*.)  Since then, he has tried to manage his pain by exercising and walking.  (*Id*.)

- During the 2000 to 2001 time frame, he had difficulty standing and lifting.  (Tr. 58-59.)  He estimated he could lift no more than five pounds, and stand for only ten seconds before feeling pain and a "lack of support."  (Tr. 59.)

-  From April 1998 to November 1999, his wife and daughter had to do everything for him, including assisting him with basic needs such as toileting and showering.  (Tr. 62.)  During this time frame, he was unable to stand up on his own.  (*Id*.)  He was still severely limited after November 1999, but it got a

---

the SSA office.  (Tr. 40-41, 63-64, 74.)  The ALJ held the record open for 30 days to allow Yosowitz to resubmit the records.  (Tr. 40-41, 74-76.)  In a post-hearing brief, however, Yosowitz's counsel acknowledged that "we have not received evidence that confirms claimant suffered a stroke prior to his date last insured."  (Tr. 276.)  In his written decision, the ALJ found that, in light of the lack of supporting medical evidence, Yosowitz's alleged stroke was a non-medically determinable impairment.  (Tr. 24.) Yosowitz does not challenge that finding herein.

11

little bit better.  (Tr. 63.)

The VE testified Yosowitz had past work as a president of a furniture store (sedentary, skilled, SVP 8).  (Tr. 68.)  The ALJ then posed the following hypothetical question:

> Assume an individual who is able to lift and carry no more than 20 pounds occasionally and 10 pounds frequently, standing and walking for approximately six hours in an eight-hour workday, sitting for approximately six hours in an eight-hour workday, able to occasionally climb ladders, ropes or scaffolds– let's see, it's during this period, we're going to go never climb ladders, ropes, and scaffolds. Occasionally stoop, occasionally climb ramps or stairs, stoop, crouch, balance, and crawl.  And I want you to limit this individual to routine tasks with no fast-paced work, no strict production quotas.  Also, put in a limitation for avoiding all exposure to hazards, and by that I mean dangerous machinery, unprotected heights, et cetera.  Let's see here real quick.  Also, put down avoid concentrated exposure to temperature extremes of hot and cold.  * * * With that hypothetical, would the hypothetical individual be able to perform the past work of Mr. Yosowitz?

(Tr. 70.)

The VE testified the hypothetical individual would not be able to perform Yosowitz's past work as a president of a furniture store.  (Tr. 71.)  The VE testified the hypothetical individual would, however, be able to perform other representative jobs in the economy, such as mailroom clerk, order caller, and housekeeping cleaner.  (Tr.  71-72.)

The ALJ then posed a second hypothetical that limited the individual to work at the sedentary level, along with the mental limitation to routine tasks with no fast-paced work or strict production quotas.  (Tr. 72-73.)  The VE testified the hypothetical individual would not be able to perform Yosowitz's past work as a president of a furniture store.  (Tr. 73.)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason

12

of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his

13

past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Yosowitz was insured on his alleged disability onset date, April 15, 1998, and remained insured through December 31, 2000, his DLI. (Tr. 19.) Therefore, in order to be entitled to POD and DIB, Yosowitz must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2000.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of April 15, 1998 through the date last insured of December 31, 2000 (20 CFR 404.1571 *et seq.*).

3.  Through the date last insured, the claimant had the following severe impairments: coronary artery disease, status post angioplasty with stent placement; lumbar degenerative disc disease, status post L4-5 laminectomy surgeries; depressive disorder; anxiety disorder; and substance dependence (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), as follows: lift and/or carry no more than 20 pounds occasionally and 10 pounds frequently; stand and/or walk for approximately six hours in an eight-hour workday; sit for approximately six hours in an eight-hour workday; never

14

climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, stoop, crouch, balance, and crawl; avoid concentrated exposure to hot and cold temperature extremes; avoid all exposure to hazards, such as dangerous machinery and unprotected heights; and limited to routine tasks with no fast paced work and no strict production quotas.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on October **, 1949 and was 48 years old, which is defined as a younger individual age 18-49, as of his alleged onset date.  He subsequently changed age categories and was 51 years old as of the date last insured, which is defined as closely approaching advanced age (20 CFR 404.1563).

8.      The claimant has at least a high school education and was able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled," during the time period in question, whether or not the claimant had transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from April 15, 1998, the alleged onset date, through December 31, 2000, the date last insured (20 CFR 404.1520(g)).

(Tr. 19-31.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the

Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at

* 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made pursuant to

proper legal standards.  *See Ealy,* 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc.*

16

*Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.        First Assignment of Error**

Yosowitz's brief appears to raise several interrelated (but separate) arguments.  First, Yosowitz claims the ALJ's RFC assessment is "flawed" because it is "clearly not based upon all relevant evidence."  (Doc. No. 12 at 5.)  Specifically, Yosowitz asserts the RFC fails to adequately account for his back pain, which he claims rendered him "unable to tolerate the physical demands of light work."  (*Id*. at 6.)  He argues the ALJ improperly failed to list "failed back syndrome as a severe impairment and thus it is unclear whether the ALJ factored the effects of this condition on Plaintiff's ability to perform the demands of light work."  (*Id*.)

17

Next, Yosowitz appears to challenge the ALJ's credibility assessment, arguing "the reasons that the ALJ used to discredit Plaintiff's testimony and his complaints are flawed."  (*Id.* at 7.)  In particular, Yosowitz maintains the ALJ should not have found him lacking in credibility due to his refusal to follow through with a more aggressive treatment protocol because "the evidence suggests his psychiatric condition played a role in Plaintiff's decision not to be admitted or treated for his pain."  (*Id.*)

Finally, Yosowitz argues that "[g]iven that this case was complicated because of the remote DLI, the unavailability of certain evidence given the time that had elapsed and the obvious overlap in physical and mental impairments, the ALJ erred by not calling a medical expert for clarification on these issues."  (*Id.* at 8.)  Citing HALLEX I-2-6-70 and Social Security Ruling 83-20, Yosowitz asserts the ALJ should have consulted with a medical expert ("ME") "when claimant alleges disability that began before his DLI and the facts may conceivably support the claim."  (*Id.*)  In particular, he argues an ME was necessary to address the following issues:

> The ALJ assumptions about Plaintiff's refusal to obtain the treatment could have been adjudicated more thoroughly and resolved.  The issue about whether, given the MRI findings, and the diagnosis of failed back syndrome, it was advisable for Plaintiff to stand/walk six (6) out of eight (8) hours could have been discussed and resolved.   A medical expert could have stated [sic] clarified Plaintiff's maximum RFC to a reasonable degree of medical certainty.  Had it been a sedentary RFC, Plaintiff would have been declared disabled pursuant to the medical-vocational
> guidelines, a fact of which the ALJ was well aware.

(*Id.* at 9.)

The Court will address each of these arguments in turn, below.

**A.      RFC**

18

Yosowitz first claims the RFC is not supported by substantial evidence because it fails to adequately account for his back pain.  The Commissioner argues the ALJ fully considered the medical evidence regarding Yosowitz's two back surgeries and chronic back pain.  (Doc. No. 15 at 9-10.)  She maintains the ALJ's RFC assessment is supported by substantial evidence, including the opinions of both state agency physicians and evidence of Yosowitz's ability to exercise during the relevant time period.  (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with

19

an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her*, 203 F.3d at 391.

Here, at step two, the ALJ determined Yosowitz suffered from the severe impairments of coronary artery disease, status post angioplasty with stent placement; lumbar degenerative disc disease, status post L4-5 laminectomy surgeries; depressive disorder; anxiety disorder; and substance dependence.  (Tr. 21.)  The ALJ recounted Yosowitz's hearing testimony and the medical evidence regarding his chronic back pain, noting in particular that Yosowitz required back surgeries in both 1994 and 1997 but still continued to experience constant back pain after his 1997 surgery.  (Tr. 25-26.)  The decision discussed treatment notes from the relevant time period documenting Yosowitz's back pain and stiffness, and specifically noted his diagnosis with failed back syndrome.  (*Id*.)  In addition, the ALJ acknowledged Yosowitz's February 1999 MRI, which showed some epidural fibrosis, narrowing of the intervertebral disc spaces from L4 through S1, and osteroarthrosis at the facet joints at L5-S1 with at least moderate foraminal narrowing. (Tr. 26.)

The ALJ found that Yosowitz's medically determinable impairments could reasonably be expected to cause his alleged symptoms; however, his statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible" for a variety of reasons.  (Tr. 25.)  In particular, the ALJ noted that "despite his alleged back pain, the claimant admitted to working out during the relevant time period with continued walking."  (Tr. 28.)  The ALJ also found Yosowitz "only received minimal conservative treatment for his physical

impairments," including his back pain.  (*Id*.)  In this regard, the ALJ noted that "while a lumbar MRI showed adverse findings, surgery was not recommended, the claimant's physical examinations were mostly normal, and he rejected the treatment recommendation of his orthopedic surgeon; i.e., physical therapy and psychiatric consultation."  (*Id*.)  The ALJ concluded that "the fact that the claimant refused to follow through with a more aggressive treatment protocol is evidence that his physical impairments were not as severe as alleged and, thus, he would have been capable of performing light exertional work with the above postural and environmental limitations."  (*Id*.)

The ALJ then discussed the opinion evidence, according significant weight to the opinions of state agency physicians Drs. Lewis and Green that Yosowitz was capable of performing a reduced range of light work.  (Tr. 27.)  The ALJ, however, found that "additional postural limitations were warranted due to the claimant's lumbar degenerative disc disease, status post discectomy surgeries."  (*Id*.)

Finally, the ALJ formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), as follows: lift and/or carry no more than 20 pounds occasionally and 10 pounds frequently; stand and/or walk for approximately six hours in an eight-hour workday; sit for approximately six hours in an eight-hour workday; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, stoop, crouch, balance, and crawl; avoid concentrated exposure to hot and cold temperature extremes; avoid all exposure to hazards, such as dangerous machinery and unprotected heights; and limited to routine tasks with no fast paced work and no strict production quotas.

(Tr.  24.)

Yosowitz argues the RFC is not supported by substantial evidence because the ALJ did not list "failed back syndrome" as a severe impairment and it is therefore "unclear" whether he

considered the effects of this condition in fashioning the RFC.  The Court rejects this argument.

The ALJ expressly found Yosowitz's "lumbar degenerative disease, *status post L4-5 laminectomy surgeries*" to be a severe impairment at step two.  (Tr. 21) (emphasis added).

Moreover, the decision specifically notes that Yosowitz (1) had two previous back surgeries; (2) continued to suffer from chronic back pain after the 1997 surgery; and (3) was diagnosed with failed back syndrome.  (Tr. 25-26.)  In light of the above, the Court finds the ALJ's failure to use the specific words "failed back syndrome" at step two does not indicate that he failed to consider this condition in fashioning the RFC at step four.  Rather, it is clear from the ALJ's discussion of the medical evidence that he was fully aware of Yosowitz's failed back syndrome and took it into account in determining Yosowitz's physical functional limitations.[9]

The Court further finds the ALJ properly considered Yosowitz's back impairment in

---

[9] Even if the ALJ erred in omitting Yosowitz's failed back syndrome as a severe impairment at step two of his analysis, any error in that regard is harmless.  Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared. *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 Fed. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  Here, although the ALJ did not expressly list Yosowitz's failed back syndrome as a severe impairment, he found that Yosowitz's coronary artery disease, lumbar degenerative disc disease status post L4-5 laminectomy surgeries, depressive disorder, anxiety disorder, and substance dependence were severe impairments.  (Tr. 21.)  Accordingly, Yosowitz cleared step two of the analysis, and any argument that the ALJ erred at step two is of no consequence. *See Anthony*, 266 Fed. App'x at 457.

formulating the RFC.  Despite Yosowitz's assertions to the contrary, the ALJ fully discussed

Yosowitz's complaints of chronic back pain and stiffness at step four.  The ALJ acknowledged

Yosowitz's hearing testimony regarding his two back surgeries and continued back pain, and

thoroughly discussed the medical evidence from the relevant time period regarding this

condition.  (Tr. 25-26.)  The ALJ found, however, that greater physical functional limitations

were not warranted in light of Yosowitz's "relatively normal" physical examinations, rejection

of treatment recommendations from his orthopedic surgeon, and ability to exercise "with

continued walking."  (Tr. 28.)  In addition, the ALJ found further support for the RFC in the fact

that "no treating or examining physician found that the claimant was disabled or even limited to

an extent greater than that outlined in his [RFC] prior to his date last insured."  (*Id*.)

The ALJ's finding is supported by substantial evidence in the record.  As noted

previously, while clinical examinations often noted pain, tenderness and limited range of motion,

they also revealed normal sensory function and reflexes; no asymmetrical weakness or radicular

signs in his upper extremities; normal Babinski signs; and 4/5 to 5/5 strength in his bilateral

lower extremities.  (Tr. 776, 780, 824.)  Moreover, Yosowitz does not challenge the ALJ's

finding that he was able to exercise "with continued walking" during the relevant time period,

nor does he argue it was improper for the ALJ to rely on this evidence in formulating the RFC.

Notably, Yosowitz also fails to contest the ALJ's determination that no treating or examining

physician opinion found him to be more restricted than indicated in the RFC.

Yosowitz does argue, however, that the ALJ improperly relied on his failure to follow

through with treatment recommendations to pursue physical therapy and pain management

consultation.  In this regard, Yosowitz notes he received mental health treatment for substance

23

abuse, depression, and anxiety in September 2000 and March 2001, at which time he received diagnoses of mixed personality disorder and mood disorder and was assessed a GAF of 40.  (Tr. 792-798, 805-808.)  Yosowitz then summarily maintains that "his psychiatric condition played a role in Plaintiff's decision not to be admitted or treated for his pain" and "the ALJ should not [have] discredited Plaintiff for his failure to have additional treatment for his physical conditions given the severity of his underlying mental health impairments."  (Doc. No. 12 at 7-8.)

The Court rejects this argument.  While the record indicates Yosowitz suffered from various substance abuse and mental health impairments, Yosowitz cites no evidence indicating these impairments prevented him from seeking medical treatment for his back pain or other physical impairments during the relevant time period.  Indeed, the record reflects that, during this time period, Yosowitz presented to Dr. Lieberman and Dr. Sinks on at least three occasions and visited the ER multiple times for treatment of his back pain and cardiac condition.  (Tr.  328-332, 771-780, 823-824.)  Yosowitz presents no explanation as to why he was able to seek this treatment for his physical conditions despite his mental health impairments, but unable to pursue physical therapy and pain management consultation as recommended by his physicians. Moreover, Yosowitz does not direct this Court's attention to any treating or examining physician opinion suggesting Yosowitz's mental impairments impacted his ability to pursue further treatment for his back pain.

Finally, the Court also finds that Yosowitz has not adequately explained in what respect the RFC fails to accommodate his back pain.  The RFC expressly limits Yosowitz to light work with additional postural restrictions, including limiting him to occasional stooping, crouching, balancing and crawling; occasional climbing of ramps and stairs; and never climbing ladders,

24

ropes and scaffolds.  (Tr. 24.)  Yosowitz does not articulate any specific, additional restrictions that he believes should have been included in the RFC due to his back pain.  Moreover, he does not direct this Court's attention to any medical opinion in the record that identifies specific functional limitations relating to his back pain that are more restrictive than that set forth in the RFC.

Accordingly, and for all the reasons set forth above, the Court rejects Yosowitz's argument that the ALJ failed to properly consider his back impairment in formulating the RFC. This assignment of error is without merit.

### B.  Credibility

It is unclear but, construing Yosowitz's brief liberally, it appears he is also challenging the ALJ's credibility assessment.  Specifically, Yosowitz argues "the reasons that the ALJ used to discredit Plaintiff's testimony and his complaints are flawed."  (Doc. No. 12 at 7.)  In particular, he maintains the ALJ should not have questioned his credibility because of his refusal to follow through with a more aggressive treatment protocol in light of his severe mental impairments. (*Id.*)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96–7p, 1996 WL 374186 (July 2, 1996).

25

Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").  To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose,

26

1996 WL 374186 (July 2, 1996).  Beyond medical evidence, there are seven factors that the ALJ

should consider.[10]  The ALJ need not analyze all seven factors, but should show that he

considered the relevant evidence.  *See Cross*, 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406

F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

       As noted above, the ALJ found that Yosowitz's medically determinable impairments

could reasonably be expected to cause his alleged symptoms; however, his statements

concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely

credible."  (Tr. 25.)  The ALJ provided several reasons for this credibility determination.  First,

the ALJ noted that "despite his alleged back pain, the claimant admitted to working out during

the relevant time period with continued walking."  (Tr. 28.)  The decision then emphasized that

Yosowitz "only received minimal conservative treatment for his physical impairments," noting

that "surgery was not recommended, the claimant's physical examinations were mostly normal,

and [Yosowitz] rejected the treatment recommendation of his orthopedic surgeon; i.e., physical

therapy and psychiatric consultation."  (*Id*.)

       The ALJ also remarked that "most of the claimant's mental health treatment surrounded

---

[10] The seven factors are: (1) the individual's daily activities; (2) the location, duration,
frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate
the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the
individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other
than medication, the individual receives or has received for relief of pain or other
symptoms; (6) any measures other than treatment the individual uses or has used to
relieve pain or other symptoms; and (7) any other factors concerning the individual's
functional limitations and restrictions due to pain or other symptoms.  SSR 96–7p,
Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732–733
(N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her
credibility findings in terms of the factors set forth in the regulations, thereby permitting
the court to "trace the path of the ALJ's reasoning.")

his substance dependence." (Tr. 28.)  The ALJ found that "despite being addicted to prescription pain medications and drug seeking behavior," Yosowitz's thoughts were logical and relevant, he appeared oriented in all spheres, there was no evidence of psychosis or cognitive dysfunction, and he appeared motivated for treatment.  (*Id*.)  The ALJ determined that "although the claimant has a history of substance abuse, a full review of the record shows that the condition was episodic and that the claimant was able to function quite well when he was taking his medications appropriately and otherwise complying with his prescribed medical treatment." ( Tr. 29.)

Finally, the ALJ observed that "no treating or examining physician found that the claimant was disabled or even limited to an extent greater than that outlined in his [RFC] prior to his date last insured." (Tr. 28.)  He concluded that "given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of greater restrictions placed on the claimant by a treating doctor, yet a review of the record reveals no such restrictions." (Tr. 28-29.)

The Court finds the ALJ did not improperly assess Yosowitz's credibility.  As noted previously, the decision thoroughly considered both the medical and opinion evidence regarding Yosowitz's impairments.  The ALJ provided a number of specific reasons for finding Yosowitz to be less than fully credible, including his ability to exercise, conservative treatment history, and decision to reject the treatment recommendations of his orthopedic surgeon, as well as the lack of a treating or examining physician opinion supporting more restrictive limitations.

Yosowitz's only specific challenge is to the ALJ's decision to discount Yosowitz's credibility because he failed to pursue treatment recommendations for his physical impairments.

For the reasons discussed above, however, the Court finds it was not improper for the ALJ to rely on Yosowitz's failure to obtain recommended treatment, such as physical therapy and/or pain management consultation.  Moreover, even if the ALJ did err in this regard (which the Court finds he did not), the ALJ cited numerous other specific reasons for discounting Yosowitz's credibility.  Notably, Yosowitz does not argue that any of these other reasons are not supported by substantial evidence.

It is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds*, 2011 WL 1228165 at * 2 (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for his credibility determination and supported those reasons with reference to specific evidence in the record.  Yosowitz's argument to the contrary is without merit.

### C.      Failure to Consult an ME

Finally, Yosowitz argues the ALJ erred in failing to call a medical expert.  He maintains ME testimony was necessary "because of the remote DLI, the unavailability of certain evidence given the time that had elapsed and the obvious overlap in physical and mental impairments." (Doc. No. 12 at 8.)  Relying on HALLEX I-2-6-70[11] and Social Security Ruling ("SSR") 83-20,[12]

---

[11]HALLEX is the acronym for "Hearings, Appeals, Litigation and Law (LEX)" manual and contains both procedural instructions and substantive material for all cases under the jurisdiction of the Office of Hearings and Appeals (OHA).  *See Kostyo v. Colvin*, 2015

Yosowitz asserts the ALJ should have consulted with a medical expert ("ME") "when claimant alleges disability that began before his DLI and the facts may conceivably support the claim." (*Id*.)  He argues an ME "could have clarified Plaintiff's maximum RFC to a reasonable medical certainty," and shed light on the reasons for Yosowitz's refusal to obtain treatment recommended for his physical impairments.  (*Id*. at 9.)

The Commissioner asserts the ALJ did not abuse his discretion in failing to call an ME. (Doc. No. 15 at 15.)  She first argues that neither HALLEX I-2-6-70 nor SSR 83-20 require the ALJ to consult an ME regarding Yosowitz's onset date.  She maintains "this HALLEX provision (like SSR 83-20) should be understood as referring to cases in which an ALJ concludes that a claimant became disabled at some point during the time period under consideration and must make a finding about when disability onset occurred."  (*Id*. at 14.)  Because the ALJ herein did not make a finding of disability, the Commissioner argues that neither the HALLEX provision or SSR 83-20 required him to consult an ME to make an inference about the onset date.  Lastly, the Commissioner argues an ME was not necessary because "nothing in [Yosowitz's medical] records require the ALJ to conclude that reliance on the State agency opinions was inappropriate or that obtaining another medical opinion concerning whether Plaintiff was disabled from April 1998 through December 1999 was necessary."  (*Id*. at 17.)

Social Security regulations place the burden on a claimant to prove the existence of a

WL 4067260 at fn 3 (N.D. Ohio July 2, 2015).

[12] "Social Security Rulings [or "SSRs"] do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner."  *Ferguson v. Comm'r of Soc. Sec*., 628 F.3d 269 at fn 1 (6th Cir. 2010) (quoting 20 C.F.R. § 402.35(b)(1)).

disability.  *Foster v. Haller*, 279 F.3d 348, 353 (6th Cir. 2001).  However, "[o]nce a finding of disability is made, the ALJ must determine the date of onset."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.  2006).  Social Security Ruling 83-20 governs the determination of disability onset date.  *See* SSR 83-20, 1983 WL 31249 (1983).  With regard to disabilities of a "non-traumatic" origin, this Ruling provides that the ALJ should consider "the applicant's allegations, work history and the medical and other evidence concerning impairment severity."  *Id.* at *2.  The Ruling further provides, in relevant part, as follows:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.
>
> * * *
>
> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available.  When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy.  However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.
>
> * * *
>
> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  **At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.**

*Id.* at * 2-3 (emphasis added).   HALLEX I-2-6-70 (regarding ME testimony) similarly provides that "[a]n ALJ is encouraged to consult with an ME when he or she must make an inference about the onset of disability."  *See* HALLEX I-2-6-70 at Note 3 (citing SSR 83-20).

31

The Sixth Circuit has found that an ALJ is not required to refer with specificity to SSR 83-20 when making disability onset date determinations, so long as the ALJ conducts the analysis required by the Ruling.  *See McClanahan*, 474 F.3d at 834 ("Because the ALJ conducted the analysis required by [SSR 83-20], his failure to mention it by name is not fatal to the decision").   Moreover, with regard to the need for an ME, courts in this Circuit have found that SSR 83-20 does not require that an ME be called in every case but only when "there is no development of the medical record on which the ALJ can rely to ascertain onset."  *Id.* at 837. *See also Slack v. Astrue*, 2010 WL 420022 at * 3 (N.D. Ohio Jan. 29, 2010) (same); *Martin v. Comm'r of Soc. Sec.*, 2014 WL 1048150 at * 18 (E.D. Mich. March 18, 2014) (stating that SSR 83-20 requires an ALJ to call an ME only "when the record is ambiguous regarding onset date").

The Court finds the ALJ did not commit legal error in failing to consult an ME because Yosowitz has not demonstrated the record was ambiguous as to his onset date.  As noted above, the record before the ALJ contained medical evidence (including treatment notes, ER records, and objective test results) regarding Yosowitz's severe physical and mental impairments during the relevant time period; i.e., from April 1998 through December 2000.  Moreover, as the Commissioner correctly notes, the record included several state agency physician opinions regarding Yosowitz's impairments during that same time period.  The ALJ performed a thorough and considered review of both the medical and opinion evidence, and found it did not support a finding of disability.  Indeed, as set forth *supra*, this Court has found that the ALJ's RFC limiting Yosowitz to a reduced range of light work during this period is supported by substantial evidence.

Given the above, the Court finds the ALJ was not required by either SSR 83-20 or

HALLEX I-2-6-70 to consult an ME regarding Yosowitz's onset date.  Both of those sources advocate the use of an ME when an ALJ must make an inference about the onset of disability. Here, however, Yosowitz has not shown that the medical record was ambiguous or under-developed as to his disability onset, nor has he otherwise demonstrated that the ALJ was required to make an inference about the onset of disability.[13]  In the absence of such a showing, the Court finds the ALJ was not required to consult an ME regarding the issue of onset.  *See McClanahan*, 474 F.3d at 837 (SSR 83-20 only requires an ME when "there is no development of the medical record on which the ALJ can rely to ascertain onset"); *Slack*, 2010 WL 420022 at * 3 (same); *Martin*, 2014 WL 1048150 at * 18 (SSR 83-20 requires an ALJ to call an ME "when the record is ambiguous regarding onset date").

The Sixth Circuit's decision in *McClanahan* is instructive.  In that case, McClanahan first applied for disability benefits and SSI in December 1997, claiming he was unable to work beginning in February 1997 due to degenerative disc disease.  *McClanahan*, 474 F.3d at 832. This application was denied and, after a hearing, an ALJ issued a written decision denying his disability claim.  *Id.*  McClanahan appealed and, upon cross-motions of the parties, the district court remanded for neuropsychological evaluation and a supplemental hearing.  *Id.*  Upon remand, a different ALJ found McClanahan was disabled as of July 27, 2001, due to organic brain dysfunction, but not disabled prior to that date.  *Id.*  On appeal, the district court upheld the ALJ's denial.

---

[13] As noted *supra*, the ALJ did find there was insufficient medical evidence in the record regarding Yosowitz's alleged stroke in April 1998 and, therefore, concluded that stroke was a non-medically determinable impairment.  (Tr. 24.)  Yosowitz does not argue, however, that ME testimony regarding his onset date was required pursuant to SSR 83-20 because of the lack of medical evidence in the record regarding his stroke.

McClanahan then appealed to the Sixth Circuit, arguing remand was required because the ALJ failed to either explicitly reference SSR 83-20 or call an ME to infer the date of onset. The Sixth Circuit disagreed.  First, the court determined the ALJ was not required to refer with specificity to SSR 83-20, finding that "[b]ecause the ALJ conducted the analysis required by the Ruling, his failure to mention it by name is not fatal to the decision."  *Id*. at 834.  The court explained that the ALJ conducted a thorough and considered review of the record, recounting in some detail the ALJ's discussion of the medical evidence and his conclusions.  *Id.* at 834-836.

The court then addressed McClanahan's argument that the ALJ erred in failing to call an ME and rejected it, explaining as follows:

> Upon review, we find no merit to McClanahan's claim that the ALJ erred by not requiring a medical expert to infer an onset date pursuant to SSR 83–20.  The portion of the ruling that McClanahan relies on contemplates situations when an individual claims disability and there is no development of the medical record on which the ALJ can rely to ascertain onset. This is not the case here. In fact, McClanahan's medical record was well developed and carefully reviewed by the ALJ.

*Id*. at 836-837.  Accordingly, the court found the ALJ did not err in this regard and, further, that substantial evidence supported his decision that McClanahan was not disabled prior to July 27, 2001.

As in *McClanahan*, the ALJ in the instant case was not faced with a situation where "there is no development of the medical record on which . . . to ascertain onset."  *Id.*   To the contrary, here, the medical record contained treatment notes, ER records, and objective test results regarding Yosowitz's severe impairments during the relevant time period, which were thoroughly reviewed the ALJ in rendering his disability determination.  Given this record, Yosowitz has simply not established the ALJ was required to make an inference regarding onset

34

such as to necessitate the assistance of an ME.[14]  Accordingly, his argument to the contrary is

without merit.

Yosowitz also asserts more generally that the ALJ should have called an ME in order to

"clarif[y] Plaintiff's maximum RFC to a reasonable medical certainty," and shed light on the

reasons for Yosowitz's refusal to obtain treatment recommended for his physical impairments.

(Doc. No. 12 at 9.)  The Court rejects this argument.  "An administrative law judge's

determination of whether a medical expert is necessary is inherently a discretionary decision."

*Ruby v. Colvin*, 2014 WL 5782930 at *13 (S.D. Ohio Nov. 6, 2014).  *See also Nebra A. Simpson*

*v. Comm'r of Social Security*, 2009 WL 2628355 (6th Cir. Aug. 27, 2009) (unreported) at *8;

*Foster,* 279 F.3d at 355 (finding an ALJ has the "discretion to determine whether further

evidence, such as additional testing or expert testimony, is necessary.");  *O'Neill v. Colvin*, 2014

WL 3510982 at * 18 (N.D. Ohio July 9, 2014) ("ALJs retain discretion as to whether to call a

medical expert");  *Slack*, 2010 WL 420022 at * 3 (stating that "the decision use a medical expert

is discretionary").  Indeed, SSA regulations expressly give an ALJ discretion to determine

---

[14]  As noted *supra*, although Yosowitz's applications for POD and DIB for the time
period April 1998 to December 2000 were denied, he also filed an SSI application in
September 2012.  That application was granted and Yosowitz was found disabled
effective the date of the application.  (Tr. 19, 119.)  While not cited by either party, the
Court notes there are cases that have remanded to require an analysis under SSR 83-20
where a prior finding of disability exists.  *See e.g., Smits v. Colvin*, 2015 WL 505465
(E.D. Ky.  Feb. 6, 2015); *Martin*, 2014 WL 1048150 (E.D. Mich. March 18, 2014).  In
those cases, however, there was a complete lack of evidence from the relevant time
periods, rendering onset ambiguous and requiring the ALJ to make an inference
regarding the proper onset date.  In the instant case, by contrast, the record contains
treatment notes, emergency room records, objective test results, and opinion evidence
relevant to the time period at issue.  As noted above, Yosowitz has not shown that the
medical record was ambiguous or under- developed as to his disability onset, nor has he
otherwise demonstrated that the ALJ was required to make an inference about the onset
of disability.

whether to consult a medical expert. *See* 20 C.F.R. §§ 404.1527(e)(2) (iii), 416.927(e)(2)(iii)

(An ALJ "*may* ... ask for and consider opinions from medical experts on the nature and severity

of [a claimant's] impairment" (emphasis added)).   An ALJ abuses his discretion only when the

testimony of a medical expert is "'required for the discharge of the ALJ's duty to conduct a full

inquiry into the claimant's allegations. *See* 20 C.F.R. § 416.1444.'" *Ruby,* 2014 WL 5782930 at

*13 (citing *Haywood v. Sullivan*, 888 F.2d 1463, 1467–68 (5th Cir. 1989)).

     Here, Yosowitz has not demonstrated the ALJ abused his discretion in failing to call an

ME.  As discussed at length above, the record contains both medical and opinion evidence

regarding Yosowitz's severe impairments during the relevant time period.  Yosowitz has not

sufficiently explained why an ME was necessary to evaluate this evidence or to otherwise

conduct a full inquiry into his allegations of disability.

     Accordingly, and for all the reasons set forth above, Yosowitz's argument that the ALJ

erred in failing to consult an ME is without merit.

## VII.   CONCLUSION

     For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.

       *s/ Jonathan D. Greenberg*
       Jonathan D. Greenberg
       United States Magistrate Judge

Date: September 1, 2016

## OBJECTIONS

     **Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of
this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within
the specified time may waive the right to appeal the District Court's order.  *See United
States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g
denied*, 474 U.S. 1111 (1986).**